## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| MATTHEW GRAY | ) |
| | ) |
| _PLAINTIFF_ | ) |
| | ) |
| v. | ) |
| | ) |
| JOSEPH E. AOUN, JAMES BEAN | ) |
| RONALD STARR, GREGORY GODDALL. | ) |
| SCOTT EDMISTON, BRUCE RONKIN, | )  CIVIL ACTION NO.: |
| FIONA GERMAINE, CHRISTOPHER | ) |
| FRANSON, JAMES BEAN, ELIZABETH | ) |
| HUDSON, MARK NARDONE, WENDY | ) |
| LYNCH, REGINA COPPA, | ) |
| NORTHEASTERN UNIVERSITY, | ) |
| INDIVIDUALLY AND ON BEHALF OF | ) |
| NORTHEASTERN UNIVERSITY, and | ) |
| JOHN DOES 1-5 | ) |
| _DEFENDANTS_ | ) |

_____)

## COMPLAINT AND JURY CLAIM

### I.   INTRODUCTION

1.     This action is brought by Matthew Gray (hereinafter also

"Gray" or "Plaintiff Gray") to redress civil rights deprivations of clearly

established law under the First and Fourteenth Amendments of the

United States Constitution in violation of 42 U.S.C. § 1983, and to seek

redress for a pendant breach of contract claim grounded in

Massachusetts state law.  Gray seeks declaratory, compensatory,

injunctive, exemplary (punitive) relief and attorney fees.

2.     The allegations contained in this lawsuit are derived from written Northeastern University (hereinafter "NEU") policy, discovery obtained, and recordings from court proceedings in the criminal case of Commonwealth of Massachusetts v. Matthew Gray, Roxbury Division of the Boston Municipal Court ("Roxbury District Court"), Docket No. 1502CR284, including emails, transcripts of witnesses who testified at trial, law enforcement and administration officials, from the investigation of Gray's counsel, and from reasonable inferences drawn from these sources.  On information and belief, there is a factual basis for the allegations made herein, or to be drawn from the reasonable inferences, and as further discovery is made.

## II.     **JURISDICTION AND VENUE**

3.     The Court has jurisdiction over the federal issues and questions raised in this Complaint pursuant to 28 U.S.C. § 1331, including matters arising under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

4.     The Court has supplemental jurisdiction over the pendant state law breach of contract claim pursuant to 28 U.S.C. § 1367.

5.     Each of the constitutional violations alleged against the defendants named herein is a violation of clearly established precedent, and as such, qualified immunity does not apply to any named defendant on the Constitutional claims.

6.     Venue for the causes of action alleged against the defendants herein lies in the United States District Court for the District of Massachusetts because the acts which are the basis for these federal and state claims took place within the boundaries of this judicial district

## III.   PARTIES

7.     Plaintiff Gray is a male citizen of Canada, is a legal permanent resident of the United States, and is and was a resident of Essex County, in the Commonwealth of Massachusetts, and is and was at all times relevant, previously employed as an adjunct professor of theater and media at NEU in Boston, Massachusetts.

8.     Each of the named defendants is a "person" subject to suit within the meaning of 42 U.S.C. § 1983 and was at all times relevant acting under color of law and subjected, or caused to be subjected, Gray, a Canadian citizen who has a lawful right to be present in the United States, to the deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States, and is liable to Gray for the injuries caused by said deprivations.

9.     Defendant, Joseph E. Aoun (hereinafter "Aoun") is a resident of the Commonwealth of Massachusetts and at all times relevant was the President of NEU.  Aoun is being sued in his personal capacity in all respects and is being sued in his official capacity for injunctive and prospective relief pursuant to Ex Parte Young, 209 U.S. 123 (1908).

10.    Defendant, James C. Bean (hereinafter "Bean") is a resident of the Commonwealth of Massachusetts and at all times relevant was the provost and Senior Vice President of Academic Affairs of NEU.  Bean is being sued in his personal capacity in all respects and is being sued in his official capacity for injunctive and prospective relief pursuant to Ex Parte Young, 209 U.S. 123 (1908).

11.    Defendant, Ronald Starr (hereinafter "Starr") is a resident of the Commonwealth of Massachusetts and at all times relevant was the Director of the Media Studio of NEU.  Starr is being sued in his personal capacity.

12.    Defendant, Gregory Goodall (hereinafter "Goodall") is a resident of the Commonwealth of Massachusetts and at all times relevant was the Associate Dean of Faculty and Staff of NEU.  Goodall is being sued in his personal capacity.

13.    Defendant, Scott Edmiston (hereinafter "Edmiston") is a resident of the Commonwealth of Massachusetts and at all times relevant was the Director of the Theatre Department at NEU.  Edmiston is being sued in his personal capacity.

14.    Defendant, Bruce (hereinafter "Ronkin") is a resident of the Commonwealth of Massachusetts and at all times relevant was the interim Dean of NEU.  Ronkin is being sued in his personal capacity.

15.    Defendant, Fiona Germaine (hereinafter "Germaine") is a resident of the Commonwealth of Massachusetts and at all times relevant

was the Director of the Human Resources of NEU.  Germaine is being
sued in her personal capacity.

16.    Defendant, Christopher Franson (hereinafter "Franson") is a
resident of the Commonwealth of Massachusetts and at all times relevant
was the Technical Director for Art and Design for NEU.  Franson is being
sued in his personal capacity.

17.    Defendant, Elizabeth Hudson (hereinafter "Hudson") is a
resident of the Commonwealth of Massachusetts and at all times relevant
was the Dean of NEU.  Hudson is being sued in her personal capacity.

18.    Defendant, Mark Nardone (hereinafter "Nardone") is a
resident of the Commonwealth of Massachusetts and at all times relevant
was the Director of Information and Security for NEU.  Nardone is being
sued in his personal capacity.

19.    Defendant, Wendy Lynch (hereinafter "Lynch") is a resident
of the Commonwealth of Massachusetts and at all times relevant was the
Sergeant Detective of Northeastern University Police.  Lynch is being
sued in her personal capacity.

20.    Defendant, Regina Coppa (hereinafter "Coppa") is a resident
of the Commonwealth of Massachusetts and at all times relevant was a
detective of the Northeastern University Police.  Coppa is being sued in
her personal capacity.

21.    Defendant John Does are unknown individuals responsible
for the Constitutional violations and causes of action alleged in this

Complaint, whose names are not known at the moment of filing this Complaint and are "persons" subject to suit within the meaning of 42 U.S.C. § 1983 and who acted to deprive Gray of his rights under the United States Constitution and the laws of the Commonwealth of Massachusetts.  These Doe defendants' actions include, but are not limited to, the fraudulent allegations that formed the basis for criminal prosecution by NEU, the Suffolk County District Attorney's Office, and the named defendants herein without probable cause, the fraudulent development of the "Munki"-related documents that targeted Gray for discipline, threats of termination, termination from NEU, and criminal prosecution in the Commonwealth of Massachusetts by the Suffolk County District Attorney's Office.

## IV.   FACTS PERTAINING TO ALL CAUSES OF ACTION

22.    Gray is a Canadian/English educator, director and actor. After obtaining his Bachelor of Fine Arts at the University of British Columbia in Vancouver (Canada), Gray went to London to study directing at the London Academy of Music and Dramatic Art (LAMDA).

23.    In 2005, Gray was offered a professorship in the Acting Faculty at Carnegie Mellon University.  While there, he also acted in local Quantum Theater's *36 Views* (2009) and directed a number of professional productions, including *Crime & Punishment,* and Harold Pinter's *The Hothouse.*

24.     In April 2011, Gray moved with his wife Kelly Gray to Massachusetts to accept an assistant professorship at Northeastern University's College of Arts, Media & Design.

25.     In accepting employment, Gray was offered a written letter of acceptance/contract dated April 29, 2015 (hereinafter "the Contract")(see Exhibit 1), which required him to abide by the contract as well as the Faculty Handbook, and any other rules and regulations pertinent to NEU.

26.     Pursuant to the Contract, Gray was eligible to receive annual re-appointments for a total of six years of full-time faculty status and would be eligible for tenure consideration in the Department of Theatre during the 2016-2017 academic year.

27.     Generally speaking, during a tenure track, an eligible candidate would begin his/her tenure as an assistant professor, and at the end of the third or fourth year review, the eligible candidate would be given a mid-track review.  This review consists of constructing the tenure documents (statement of research, statement on teaching, full academic resume including publications, public presentation and peer review). The department committee would meet and vote upon the record and if accepted, the record would go to the college tenure review committee for acceptance, and the record would then go to the associate dean for the faculty and a representative from the theatre department who would present their findings.

28.     In the spring of 2014, Gray underwent and successfully passed his mid-track review.

29.     Notwithstanding, Gray was questioned at the college level because of his interdisciplinary research and the difficulties of such a track but he received outside advice and was encouraged to remain on the interdisciplinary research track.

30.     In the summer of 2014, NEU brought in Goodall, a tenured professor and former lawyer and lobbyist, to be the associate dean for faculty and staff.

31.     Goodall e-mailed all tenure track professors to meet with each one individually, and Goodall met with Gray in October of 2014.

32.     This meeting proved to be contentious meeting as Goodall disapproved of Gray's interdisciplinary track.  Although Gray's interdisciplinary track had been previously approved when Gray accepted his Contract, Goodall told Gray to stop doing the interdisciplinary track and if he continued to do it, he was "fucked."

33.     In or around October/November 2014, Gray consulted with another tenured professor who recommended that Gray leave the theatre department entirely and stick to game design.  When Gray told Goodall of this advice two weeks later, Goodall responded, "I can't answer any of this until I talk to the Dean.  We'll have to talk later."

34.    A week later, Goodall came to Gray's office in the theatre department, told him that game design was discouraged, and Gray should stick with theatre research.

35.    As a result of these meetings, it was apparent to Gray that Goodall was trying to avoid setting up a possible failed tenure track with Gray, particularly as the Provost's office would discipline the Dean's office for failed tenure tracks and NEU would lose money.

36.    In January/February 2015, Gray was directing a production called *Columbinus*, and he began receiving hate e-mails from an unknown source. Gray reported that he was receiving troubling hate e-mails and although the department head's response told Gray that these emails were worrisome, the department head declined to take any action.

37.    When the production was completed, Gray taught a class in game design for the game design department and was told to move his office to journalism without explanation.

38.    Two weeks later, Gray was told that he had to vacate his game design office and that he had to do it during Easter vacation and Gray requested but was declined assistance to move.

39.    When Gray returned from Easter vacation, he saw that his office had been vandalized and his sign read "A G AY PROFESSOR".  He again reported the vandalism and hate speech to his department head who again declined to take action.

40.     Independently, in or around May or June 2015, Campus Police contacted Gray for inquiry on the matter who told him that they were first notified about the incident by a journalism professor who saw the sign.

41.     Campus police questioned Gray but he received no follow up about their investigation.

42.     In or around May of 2015, Ronkin, the interim dean, was getting ready to leave and was discussing tenure track with each of the faculty who was seeking tenure including but not limited to Gray.

43.     Gray attended a meeting with Ronkin, Goodall and Edmiston, who was the untenured head of the theatre department.

44.     At the meeting, Ronkin laid out Gray's case for tenure during which Goodall actively challenged the credibility of Gray's because he had never successfully defended a tenure track for a theatre professor.

45.     Ronkin stated that if Gray could contextualize his work in conjunction with his appointment as Artistic Direct of Salem Theatre, tenure track could likely be approved.  At this juncture, Goodall voiced his great displeasure with and lack of confidence in Gray's case, and also voiced his lack of confidence in the incoming Dean, Elizabeth Hudson's track record for successfully defending Theatre Tenure cases in her previous appointment.  It was clear to Gray that Goodall, among others, was trying to derail Gray's tenure track.

46.     On July 10, 2015, Starr e-mailed Gray, inquiring "[d]id either of you borrow one of the Mac Pros from Room 205"?, Gray responded "not me..I haven't been in that room since last semester best Matt", and Starr responded "[t]hat's what I thought. Thanks."

47.     On July 24, 2015, since Gray did not have any administrative privileges to access on any of the computers and required log in information, Gray sent an e-mail to Franson, copying Starr, requesting installation of software on the computer named Maya in the Green Screen Room and on July 26, 2015, Franson emailed Gray and agreed to assist.

48.     On August 6, 2018, Gray emailed Franson to get his assistance to reinstall Maya as there was a system failure and Franson did meet Gray at NEU and assisted in the reinstallation of the software.

49.     On August 24, 2015, Coppa, a detective with NEU Police Department contacted Gray and asked to speak with him about an investigation.

50.     On August 25, 2018, Gray met Coppa and Sergeant Detective Lynch who interviewed Gray after he was given and waived Miranda warnings.

51.     In response to inquiry by the investigators, Gray stated that he worked for the NEU Theatre Department, was unaware of the theft of any computers on campus, and was on an access list to utilize computers in certain areas in the Shillman Media Lab.

52.     Gray, upon inquiry, denied taking a computer and Coppa told Gray that she would be filing an application for a criminal complaint against him for larceny over $250.00.

53.     Thereafter, on August 25, 2018, Coppa notified Starr that Gray had denied taking the computer and that she would be filing an application for a criminal complaint against Gray in Roxbury District Court, and Coppa notified Germaine, director of NEU Human Resources about the investigation.

54.     Starr informed Coppa that he would be removing Gray's access to any and all resources to which Gray would have access, and that he would forward information about the matter to NEU for possible disciplinary action.

55.     On August 25, 2015, Gray, per instruction by Goodall, surrendered his keys

56.     On August 26, 2015, Gray received an e-mail from Goodall, requesting that Gray meet with the Dean that day but instead the meeting was scheduled for August 27, 2018 at approximately 3 pm.

57.     On August 26, 2015, Gray's email and log in password were shut off.

58.     On August 27, Gray went to the Dean's office where Goodall and a representative from Human Resources, Germaine, were present.

59.     Goodall handed Gray a letter of suspension that was dated for August 26, 2015 (23) and said "[t]his is very difficult...actually, no

this is very easy." Goodall told Gray that he and the Dean had been in front of the college senate the day before and represented to them that there was overwhelming evidence that Gray stole this computer, and cited Gray's denial in any such action during the police interview as part of that evidence.

60.    During the meeting, the Dean notified Gray in writing that he was placed on indefinite paid administrative leave immediately but Goodall informed Gray that if Gray chose to resign in writing by 5 pm that day, NEU would not pursue him in criminal proceedings.

61.    Gray asked Goodall if the resignation offer was in writing either in the termination letter or in any other document and Goodall stated "no", but verbally repeated the offer.

62.    When Gray inquired about the details of the alleged "overwhelming evidence", Gray was advised to speak with an attorney and was also told that NEU would push for his dismissal if he proceeded with the case and defended himself against the allegations.

63.    Goodall took Gray's keys and walked Gray to his office, ordering him to pack his stuff and leave.  He was ordered to return his NEU issued laptop that had been purchased for him for NEU-related use.

64.    On August 28, 2015 Edmiston e-mailed Gray requesting that he with meet him at NEU. Since the suspension letter specifically prohibited Gray from being on NEU property, Gray informed Edmiston he could not attend. Instead, Gray informed Edmiston of a grade for a

student that needing entering and coordinated returning his NEU approved laptop.

65.     NEU returned Gray's office items on or about September 8, 2015.

66.     Upon receipt of a UPS label, Gray returned his NEU approved purchased laptop he was using, and sent his syllabus to the administration upon request.

67.     On October 1, 2015, Gray received a summons for his appearance at Roxbury District Court, in Roxbury, Massachusetts for a complaint for Receiving Stolen Property in an amount over $250.00.

68.     On December 1, 2015, Gray was arraigned in Roxbury District Court and an automatic plea of not guilty was entered.

69.     On December 14, 2015, Gray received a letter from Bean, on behalf of NEU, suspended Gray without pay effective January 1, 2016 (Exhibit 3).

70.     On December 17, 2015, Gray received a letter from Hudson, on behalf of NEU, informing him that his current appointment to the position of Assistant Professor would not be renewed (Exhibit 4).

71.     On October 4, 2016, Gray's jury trial commenced.

72.     Numerous witnesses testified including but not limited to Franson, Starr, and Nardone who testified, among other things, that NEU maintains a database called Munki that was used to obtain the IP address that the stolen computer had used on July 7, 2015 and July 27,

2015 after it had been stolen, and that the IP address identified was not used by NEU.

73.     Franson testified that he was able to determine the IP address as a Comcast address, namely, c-73-38-211-68.hsd1.ma.comcast.net.

74.     Coppa testified that an administrative subpoena sought and obtained for Comcast by the Suffolk County District Attorney's Office identified Gray's residential address as belonging to the account.

75.     Coppa conceded that she never sought nor obtained a search warrant for Mr. Gray's residence to search for the stolen computer when she had the opportunity to do so and the only evidence allegedly connecting the stolen computer to Gray's address was discovery allegedly produced by Munki.

76.     Michael Campbell, an internet technology expert retained by the defense, testified that Munki is a computer system that is easily subject to data manipulation by the administrator of the account.

77.     On October 6, 2016, Gray's jury returned a verdict of not guilty.

**V.     CAUSES OF ACTION**

**COUNT I**
**FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS**
**VIOLATION-WRONGFUL TERMINATION PURSUANT TO 42 U.S.C.**
**§1983**

78.    Plaintiff restates and incorporates herein by reference allegations in paragraphs 1 through 77 as though specifically set forth herein again.

79.    Gray, as a tenure-track professor at NEU, had a property interest in his teaching job at NEU guaranteed by procedural due process under the Fourteenth Amendment.

80.    Gray, as a tenure-track professor at NEU, had a procedural due process right to a predetermination hearing under the Fourteenth Amendment with notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story before he was suspended and fired.

81.    Gray, as a tenure-track professor at NEU, had a property and liberty interest in his teaching job, reputation and standing guaranteed by procedural due process under the Fourteenth Amendment to an impartial and fair process by persons who would sit as fact finders in disciplinary proceedings against him, without having prejudged the case.

82.    Gray had a procedural due process right under the Fourteenth Amendment to predetermination process that would be free of fabricated and withheld evidence.

83.    Gray had a procedural due process right under the Fourteenth Amendment to meaningful notice and a meaningful

opportunity respond to prejudicial ex parte new material considered by the fact finder in the disciplinary proceedings against him.

84.     Gray had a procedural due process right under the Fourteenth Amendment to a rudimentary statement of the reasons and a fair indication of the evidentiary basis relied on by the decision makers (defendants) regarding his termination, to ensure that prejudicial ex-parte evidence was not used against him.

85.     Defendants violated Gray's due process right to a pre-termination hearing by extorting him to resign and the defendants would "not pursue" the criminal action they caused to be advanced against him in the Roxbury District Court.

86.     Defendants violated Gray's due process right to a pre-termination hearing by suspending him August 27, 2015, without an explanation of the employer's evidence, beyond oral representations by representatives of NEU that the evidence against Gray was allegedly "overwhelming", or an opportunity for Gray to present his side of the story, suspending Gray on December 14, 2015 without pay for a period of one year effective January 1, 2016 and failing to renew his contract on December 17, 2015.

87.     Defendants violated Gray's due process right to a fair process by insuring that his case was prejudged. The defendants, based on false information and half-truths, provided expressed opinions as to

the merits of the allegations, and acted on same without affording him process at all.

88.     Defendants violated Gray's right to be free from a process using fabricated evidence and withholding favorable evidence as well as failing to allow him to present his side of the story.

89.     Defendants violated Gray's due process right of meaningful notice and meaningful opportunity to be heard by considering prejudicial ex parte evidence in making the decision to terminate Gray. This was only after Gray refused to resign in response to the defendants "not pursuing" criminal charges against him.

90.     As a direct and proximate result of the defendants violating Gray's Fourteenth Amendment procedural due process rights, Gray has incurred damages of lost wages and benefits, loss of future earning capacity and benefits, emotional stress and mental anguish and damage to his reputation and name, costs and attorney's fees herein, and all other consequential damages.

91.     The actions of the defendants were malicious, oppressive and in reckless disregard of Gray's rights. As such, an award of punitive damages is appropriate to deter the defendants from similar acts in the future.

**COUNT II**
**FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS**
**VIOLATION-SUBJECT TO CRIMINAL CHARGES BASED ON**
**FABRICATION OF EVIDENCE, WITHHOLDING OF FAVORABLE**
**EVIDENCE, FAILURE TO ADEQUATELY INVESTIGATE WITHOUT A**

## REASONABLE BASIS FOR PROBABLE CAUSE AND/OR COERCING TESTIMONY PURSUANT TO 42 U.S.C. §1983

92.     Plaintiff restates and incorporates herein by reference allegations in paragraphs 1 through 91 as though specifically set forth herein again.

93.     Gray had a liberty and property interested protected by procedural due process of the Fourteenth Amendment to be free from a prosecution based on manufactured probable cause, fabricated evidence, coerced statements, perjured testimony, failure to investigate without a reasonable basis for probable cause, and withholding of evidence negating his guilt, and which went to the credibility of witnesses.

94.     Defendants violated Gray's Fourteenth Amendment procedural due process right to be free from a prosecution based upon manufactured probable cause, fabricated evidence, coerced statements, perjured testimony, failure to investigate without a reasonable basis for probable cause, and withholding of evidence negating his guilt, and which went to the credibility of witnesses.

95.     Defendants withheld evidence, and other favorable information to Gray.

96.     Defendants submitted false and/or misleading information and documentation against Gray.

97.     Defendants attempted to force Gray to resign in a false promise for their agreement to "not pursue a [criminal] case in court,"

although they knew that it was the Suffolk County District Attorney's Office that was the only entity empowered to make prosecutorial decisions.

98.    Defendants made it clear that dismissal would occur should Gray assert his rights to defend himself against the false accusations and criminal charges in the Roxbury District Court although they knew that this representation was false as it was the Suffolk County District Attorney's Office that was the only entity empowered to make prosecutorial decisions.

99.    The actions of the defendants were deliberated and made knowingly, or deliberately indifferent, that those actions would yield false information and was used to criminally charge Gray.

100.   Based upon the actions of the defendants, the Suffolk County District Attorney's Office was fraudulently induced into filing and prosecuting criminal charges against Gray that subsequently resulted in an acquittal by a jury.

101.   As a direct and proximate result of the defendants violating Gray's Fourteenth Amendment rights, Gray has incurred damages of the costs and expenses incurred in defending himself in the Roxbury District, damage to his reputation and name and emotional stress and mental anguish, costs and attorney's fees herein, and all other consequential damages.

102.   The actions of the defendants were malicious, oppressive and in reckless disregard of Gray's rights. As such, an award of punitive damages is appropriate to deter the defendants from similar acts in the future.

**COUNT III**
**FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS**
**VIOLATION - STIGMA PLUS DOCTRINE, PURSUANT TO 42 U.S.C.**
**§1983**

103.   Plaintiff restates and incorporates herein by reference allegations in paragraphs 1 through 102 as though specifically set forth herein again.

104.   Gray, as a tenure-track professor at NEU had a liberty interest in his good name and reputation and a property interest in his continued employment protected by the procedural due process clause of the Fourteenth Amendment.

105.   Defendants made numerous defamatory statements and actions impugning Gray's good name, reputation, honor and integrity as alleged herein.

106.   Those statements were false.

107.   Those statements occurred in the course of terminating Gray, or were made to foreclose other employment opportunities.

108.   The statements were published.

109.   As a direct and proximate result of the defendants violating Gray's Fourteenth Amendment rights, Gray has incurred damages of emotional stress and mental anguish, damage to reputation and good

name, costs and attorney's fees herein, and all other consequential

damages.

110.   The actions of the defendants were malicious, oppressive and

in reckless disregard of Gray's rights. As such, an award of punitive

damages is appropriate to deter the defendants from similar acts in the

future.

**COUNT IV**
**CONSPIRACY TO VIOLATE GRAY'S RIGHTS UNDER 42 U.S.C. §1983**

111.   Plaintiff restates and incorporates herein by reference

allegations in paragraphs 1 through 110 as though specifically set forth

herein again.

112.   Gray had Fourteenth Amendment rights guaranteed under

the United States Constitution as alleged in this complaint.

113.   The defendants had an express or implied agreement among

themselves to deprive Gray of his Constitutional Rights under the

Fourteenth Amendment.

114.   The defendants conspired to violate Gray's Constitutional

Rights as alleged in Counts I-III above.

115.   The defendants did actually deprive Gray of those rights in

the form of overt acts in furtherance of the agreement.

116.   As a direct and proximate result of the defendants violating,

and conspiring to violate, Gray's Fourteenth Amendment rights, Gray

has incurred damages of lost wages and benefits, loss of future earning

capacity and benefits, emotional stress and mental anguish and damage

to his reputation and name, costs and fees for defending against the criminal charges against him in the Roxbury District Court, costs and attorney's fees herein and all other consequential damages.

117.   The actions of the defendants were malicious, oppressive and in reckless disregard of Gray's rights. As such, an award of punitive damages is appropriate to deter the defendants from similar acts in the future.

## COUNT V
## BREACH OF CONTRACT
## (PENDANT MASSACHUSETTS STATE LAW CLAIM)

118.   Plaintiff restates and incorporates herein by reference allegations in paragraphs 1 through 117 as though specifically set forth herein again.

119.   At all times relevant, NEU had issued a contract letter to Gray, outlining the responsibilities, including that all parties were to adhere to the Faculty Handbook and Professional Standards and Business Conduct Policy (collectively the "Contract").

120.   The Contract identified duties, rights and responsibilities that Plaintiff Gray, defendants, and other NEU employees reasonably relied upon (i.e. the Faculty Handbook and Professional Standards and Business Conduct Policy – hereinafter both together referred to as the "Policy"). Plaintiff Gray and NEU employees expected NEU and defendants to conform to the Contract and Policy provisions and procedures outlined therein.

121.   The Contract and Policy, and the parties' reliance on it, established a contract enforceable at law.

122.   The Contract established the parties' duties, rights and responsibilities. Each of the named defendants owed Gray the duties as set forth in the Contract and Policy and as referenced in this complaint.

123.   Plaintiff Gray did what the Contract and Policy required him to do.

124.   Each of the named defendants materially breached their duties owed to Gray under the Contract and Policy and the parties' course of conduct, by not performing the obligations as required under the policies.

125.   The policy manual of NEU contains an implied covenant of good faith and fair dealing.

126.   The breach by the named defendants has damaged Gray financially. As a direct and proximate result of the breach by the defendants, Gray has incurred damages of lost wages and benefits, loss of future earning capacity and benefits, emotional stress and mental anguish and damage to his reputation and name, costs and fees for defending against the criminal charges against him in the Roxbury District Court, costs and attorney's fees herein and all other consequential damages.

127.   The nature of the policies/contract terms breached by the defendants pertained to matters of mental concern of solicitude.   The

defendants knew or should have known that Gray would be subjected to severe emotional distress and mental anguish that would almost certainly result from a breach of those terms. Accordingly, Gray is owed damages of emotional distress and mental anguish from each of the named defendants.

128. As a result of the defendants' breach, Gray suffered economic losses, his relationship with colleagues and friends deteriorated, he was not able to pursue his chosen career in a discipline he loves, including not able to obtain the promised tenure for which he expended time and funds for decades of education. His reputation has been tarnished in the educational community, and he was financially unable to participate in all activities previously enjoyed by him and his family. He has been emotionally devastated by the actions of these defendants.

129. As a direct and proximate result of the defendants' breach, Gray has sustained emotional distress, mental anguish and damage to his good name and reputation.

130. Each of the named defendants breached the covenant of good faith and fair dealing as their actions purposefully and intentionally acted to destroy or injure Gray's right to receive the fruits of the contract. Consequently, Gray is owed exemplary damages to punish these defendants consistent with the law.

## VI. **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff Gray prays and respectfully requests the following from this Honorable Court:

1. For a declaratory Order, declaring the Defendants' conduct is in violation of the Fourteenth Amendment;

2. For actual damages of lost wages and benefits in the amount of $140,000;

3. For costs and expenses for defending himself in the Roxbury District Court in the amount of  $15,000;

4. Loss of future earning capacity and benefits, particularly in his field and as a tenured professor, in the amount of $3,350,000;

5. For severe emotional distress, mental anguish and conscious pain and suffering, in the amount of $2,000,000;

6. For punitive damages on those counts allowing same in the amount of $5,000,000;

7. For an award of costs, expert witness fees, other costs and reasonable attorney's fees, pursuant to 42 U.S.C. §1983; and

8. For any other equitable or legal relief deemed just and proper by this Honorable Court.

## VII.   <u>JURY TRIAL DEMAND</u>

Plaintiff Gray demands a trial by jury on all counts so triable.

Dated: August 24, 2018

Respectfully Submitted:
Plaintiff Matthew Gray

By his attorneys:

/s/ *Vivianne E. Jeruchim, Esq.*
/s/ *Paul J. Davenport, Esq.*

_____

Aviva E. Jeruchim, Esq.
BBO# 547598
Paul J. Davenport, Esq.
BBO#639821
Jeruchim & Davenport, LLP
50 Congress St., Suite 615
Boston, MA 02109
Tel: (617) 720-6047
E: jeruchim@jdlawyers.com
   davenport@jdlawyers.com